# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-24-197-PRW |
| ) | |
| ANTHONY LAWRENCE GRIZZARD, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Before the Court is Defendant's Motion to Dismiss the Indictment (Dkt. 20). The Motion has been denied (Dkt. 44). This opinion is in support of that denial.

### I.

Defendant Anthony Grizzard has been charged with (1) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and (2) unlawful possession of a machinegun, in violation of 18 U.S.C. § 922(o), after being arrested by the Oklahoma City Police Department in possession of a Glock pistol equipped with a "Glock switch" that made the pistol capable of fully automatic fire.

Grizzard had numerous felony convictions at the time he was arrested. In 2012, he pleaded guilty to possession of a controlled dangerous substance with intent to distribute, possession of drug paraphernalia, possession of an offensive weapon (a firearm) while

1

committing a felony, and possession of drug proceeds.[1] He received a 10-year deferred sentence for three of those counts, and one year in custody for the fourth.

In 2018, he pleaded guilty to two counts of possession of a controlled dangerous substance with intent to distribute and one count of possession of drug proceeds, for which he received a 12-year sentence for two of those counts, and a 10-year sentence for the third.[2] As a condition of his probation in that case, Grizzard was ordered by his sentencing judge to "not possess or have in [his] immediate control any firearm nor ride in a vehicle that has a firearm in it."[3] He remained subject to this condition when he was arrested in this case.[4]

Grizzard seeks dismissal of the felon in possession charge, arguing that 18 U.S.C. § 922(g)(1) violates his Second Amendment right to keep and bear arms.[5] Grizzard relies on the United States Supreme Court's decisions in *New York State Rifle and Pistol Association*

---

[1] Oklahoma County District Court, Case No. CF-2010-8135.

[2] Oklahoma County District Court, Case No. CF-2015-8057.

[3] Rules and Conditions of Supervised Probation (Dkt. 29-1).

[4] Grizzard argues that he was no longer subject to any conditions because his "active" supervision ended on February 1, 2021. Def's Reply (Dkt. 37), at 7. But even though Grizzard's "active" supervision ended, he remains under "inactive" supervision for the duration of his probationary sentence, which won't be discharged until September 18, 2030. He thus remains subject to the conditions of that sentence until that date, and he remains subject to having his sentence revoked or accelerated for any violations of the conditions happening before that date—a fact that is explicitly acknowledged by every supervisee when their "active" supervision is terminated via a standard form. *See* Okla. Dep't of Corr., *Opening, Closing and Transferring Cases Under Supervision OP-160201* attach. I ("Notice of Termination of Active Probation Supervision") (2022), https://oklahoma.gov/content/dam/ok/en/doc/documents/policy/section-16/160201ai.pdf.

[5] Grizzard challenges § 922(g)(1) both on its face and as applied to him.

v. *Bruen*[6] and *United States v. Rahimi*.[7] In decisions both before and after *Bruen*, the Tenth Circuit has squarely addressed the question presented by Grizzard's motion, concluding in both cases that prohibiting felons from possessing firearms is consistent with the Second Amendment.[8]

In *Vincent v. Garland,* the most recent of those decisions, a Tenth Circuit panel considered whether its pre-*Bruen* holding in *United States v. McCane*—that 18 U.S.C. § 922(g)(1) didn't violate the Second Amendment—remained good law after *Bruen*. The panel concluded that *Bruen*, despite having rejected the two-part balancing test adopted by the Tenth Circuit post-*Heller* and used by it in *McCane*, did not "indisputably and pellucidly" abrogate *McCane*.[9] This Court has since relied on *Vincent* in rejecting challenges similar to this one. *Vincent*, however, has now been vacated and remanded by the Supreme Court, and the case is now pending at the Tenth Circuit as it reconsiders the case in light of *Rahimi,* per the Supreme Court's mandate.

The United States insists that despite all this, *McCane* remains good law that remains binding on this Court. The United States explanation for why this is so, however, is lacking. *Rahimi*, after all, reaffirmed the holding in *Bruen*, and applied the *Bruen* test in

---

[6] 597 U.S. 1 (2022).

[7] 602 U.S. ----, 144 S. Ct. 1889 (2024).

[8] *See United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023), *cert. granted, judgment vacated*, 144 S. Ct. 2708 (2024).

[9] *Vincent*, 80 F.4th at 1202.

concluding that 18 U.S.C. § 922(g)(8) didn't violate the Second Amendment.[10] The *Vincent* panel reached a similar conclusion with respect to § 922(g)(1), but with a different mode of analysis, one that didn't apply *Bruen's* new test.[11] The vacating and remanding of *Vincent*, of course, doesn't tell us anything about the Supreme Court's view of either *Vincent's* result or its mode of analysis. All it tells us is that the Supreme Court wants the Tenth Circuit to re-evaluate the case in light of *Rahimi*.

But with respect to the Government's argument, the bottom line is this: the *Vincent* judgment is now a nullity. That being so, this Court is left without post-*Bruen* circuit precedent with respect to the question presented here: in light of *Bruen* and *Rahimi*, is 18 U.S.C. § 922(g)(1) consistent with the Second Amendment? The Court must therefore answer that question.

## II.

*Bruen* directs that a court first look to whether "the Second Amendment's plain text covers an individual's conduct," and if so, "the Constitution presumptively protects that conduct."[12] The burden then shifts to the government to rebut that presumption by demonstrating that its regulation "is consistent with the Nation's historical tradition of firearm regulation."[13]

---

[10] *See Rahimi*, 144 S. Ct. at 1898–1903.

[11] *See Vincent*, 80 F.4th at 1201–02.

[12] 597 U.S. at 24.

[13] *Id.*

The elephant in the room is the dicta from *District of Columbia v. Heller* that the *Vincent* panel relied on in concluding that it needn't apply the *Bruen* test to § 922(g)(1).[14] The *Heller* Court said that "[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]"[15] The *Heller* Court went on to describe these prohibitions as "presumptively lawful."[16] The *Bruen* Court didn't repeat this dicta (other than a passing reference to it in the context of discussing analogical reasoning),[17] although a concurring justice quoted it in his separate opinion.[18] But any notions that *Bruen* displaced the *Heller* dicta were dispelled in *United States v. Rahimi*, where the Court—in an 8-1 decision where the lone dissenter was in the majority in *Heller*—favorably quoted the *Heller* dicta.[19] In other words, all nine justices have now joined opinions that approvingly reference the *Heller* dicta. It remains, therefore, "good dicta" (for whatever that is worth), and dicta with strong persuasive value.

---

[14] *See Vincent*, 80 F.4th at 1201 (quoting *District of Columbia v. Heller,* 554 U.S. 570, 626–27 & n.26 (2008)).

[15] 554 U.S. at 626.

[16] *Id.* at 627 n.26.

[17] *See Bruen,* 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626).

[18] *Id.* at 81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626–27 & n.26).

[19] 144 S. Ct. at 1902 ("*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" (quoting *Heller,* 554 U.S. at 626–27 & n.26)).

To be fair, the suggestion of a presumption in the government's favor in cases involving "longstanding prohibitions on the possession of firearms by felons" seems at first glance to be at odds with the *Bruen* framework, which creates a presumption *against* the government at the second step. But the *Heller* dicta is best understood as a suggestion that "longstanding prohibitions on the possession of firearms by felons" presumptively fit comfortably within the Nation's historical tradition of firearms regulation—*i.e.*, that the Government can readily meet its burden at the second step.

But is 18 U.S.C. § 922(g)(1) one of those "longstanding" prohibitions that the *Heller* Court had in mind? It certainly is a "prohibition on the possession of firearms by felons," but its lineage isn't long. The Federal Firearms Act of 1938[20] was the first federal law restricting felons' access to firearms. It made it unlawful for "any person" to ship or transport "in interstate or foreign commerce" any firearm or ammunition to anyone convicted of, or indicted for, a "crime of violence," or any fugitive from justice.[21] Those convicted of crimes of violence and fugitives likewise could not "receive any firearm or ammunition that had been shipped or transported in interstate or foreign commerce."[22] So the 1938 law was both broader and narrower than § 922(g)(1) in that it applied only to those "convicted of a limited set of violent crimes such as murder, rape, kidnapping, and

---

[20] Ch. 850, §§ 1–9, 52 Stat. 1250 (repealed 1968) (originally codified as former 15 U.S.C. §§ 901–910, the provisions of which, as amended and supplemented, have been carried forward to 18 U.S.C. §§ 921–34).

[21] *Id.* § 2(d).

[22] *Id.* § 2(f).

burglary, but extended to both felons *and misdemeanants* convicted of [those] qualifying offenses."[23]

Congress didn't extend the prohibition to *all* felons until 1961, when it enacted the predecessor to § 922(g)(1).[24] So at least with respect to federal prohibitions on possession of firearms by all felons, § 922(g)(1) would be the longest standing, having been on the books in one form or the other for 63 years. Given the *Bruen* Court's emphasis on Founding- and Reconstruction-era sources, and its rejection of 20th century and late 19th century history as too "temporal[ly] distan[t]" from the Founding to "provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence,"[25] it's hard to see how a 63-year-old law could be the type of "longstanding prohibition" that might illuminate the scope of the Second Amendment.[26]

But here's the rub. If not *this* felon-in-possession law, to what other felon-in-possession laws could the *Heller* dicta have been referring? Some have pointed to a smattering of early 20th century state laws banning firearm possession by felons,[27] but again, *Bruen* rejected just such sources as too recent,[28] and in any event, they barely predate

---

[23] *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011) (emphasis added).

[24] *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961).

[25] *Bruen*, 597 U.S. at 66 (citing *Heller*, 554 U.S. at 614).

[26] *See Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 104 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024).

[27] *See id.* at 104 n.8.

[28] *Bruen*, 597 U.S. at 66 n.28.

the original federal prohibition. That leaves lower courts like this one scratching their collective heads. In this Court's view, if the *Heller* dicta is to be taken at face value, it *must* be referring to prohibitions like § 922(g)(1)—at least as applied to the violent criminals to whom the predecessor to § 922(g)(1) applied—even if that conclusion seems at first glance to be at odds with *Bruen's* preference for Founding- and Reconstruction-era sources. But as the Court will explain at step two, the squaring of this circle is at least partially possible in a case involving a felon like Grizzard.

### A.

Applying the *Bruen* framework, the Court must first determine whether the plain text of the Second Amendment applies to Grizzard and his possession of this automatic pistol.

The Government skips past this first step in its response, seemingly conceding the point to Grizzard. Understandably so. The Supreme Court has held that "'the people' . . . unambiguously refers to all members of the political community, not an unspecified subset,"[29] further explaining that the term refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[30] The Supreme Court thus concluded that there is a "strong presumption" that the Second Amendment right to keep and carry

---

[29] *Heller*, 554 U.S. at 580

[30] *Id.* (quoting *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265 (1990)).

handguns publicly for self-defense "belongs to all Americans."[31] Here, no one disputes that Grizzard is a United States citizen residing in Oklahoma, which under Supreme Court precedent would make him part of the "national community," and thus part of "the people" to whom the Second Amendment guarantees the right to keep arms.

The same would also be true with regard to whether the plain text of the Second Amendment covers possession of a *machinegun*.[32] Again, this is a question of Congress' power to regulate the scope of the right, which is resolved at the second step of the *Bruen* inquiry.[33] For example, when the *Bruen* Court mentioned the *Heller* dicta about sensitive place regulations, it did so in the context of explaining the analogical reasoning that occurs

---

[31] *Id.* at 581; *Bruen*, 597 U.S. at 70 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." (quoting *Heller*, 554 U.S. at 581)).

[32] *Bruen* tells us to determine whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24. What isn't clear is whether that means the individual's *actual* conduct, or the conduct proscribed by the regulation. That makes a difference. Grizzard was *actually* in possession of a fully automatic handgun. But § 922(g)(1) proscribes possession of *any* firearm, so proving that this particular handgun was capable of fully automatic fire won't be necessary to secure a conviction on this count. If the actual conduct is what matters, however, that injects into the second step of the *Bruen* analysis a second question, whether prohibiting Grizzard from possessing a handgun capable of fully automatic fire is consistent with our historical tradition of firearms regulation. Having not challenged the constitutionality of count two of the Indictment, Grizzard has conceded that it is.

[33] Recall that the Second Amendment didn't create a new right; it merely protected a pre-existing right from federal intrusion. The *Bruen* Court confirmed as much when it reiterated what it had said in *Heller*: that "'it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right.' The Amendment 'was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors.'" 597 U.S. at 20 (omission and emphasis in original) (internal citation omitted) (quoting *Heller*, 554 U.S. at 592, 599).

at the second step.[34] The same holds true for the question of regulation of possession of firearms by felons, or the regulation of unusual firearms. To be sure, whether a first step or second step inquiry, the result will usually be the same, but resolving these questions at the second step is the better approach not only because it is consistent with *Heller* and *Bruen*, but also because it is the approach most consistent with the original public meaning of the Second Amendment as an individual right to possess firearms for both self *and* collective defense.[35]

Because the Second Amendment's plain text covers Grizzard's conduct, "the Constitution presumptively protects that conduct."[36]

**B.**

The burden now shifts to the Government to demonstrate that § 922(g)(1)'s prohibition on firearm possession by felons is consistent with the Nation's historical tradition of firearm regulation.

As to Gizzard's facial challenge to § 922(g)(1), this is an easy task. In light of the "presumptive lawfulness" of longstanding prohibitions on the possession of firearms of felons, it is clear that at least some felons can be stripped of their right to possess a firearm. Gizzard has offered nothing to rebut that presumption; his facial challenge thus fails.

---

[34] *See Bruen*, 597 U.S. at 30.

[35] *See* Robert Leider, *The Individual Right to Bear Arms for Common Defense* 5–18 (2024), https://ssrn.com/abstract=4918009.

[36] *Bruen*, 597 U.S. at 24.

The as-applied challenge requires more work. Recall that *Heller* did not place an absolute stamp of approval on felon-in-possession laws: those prohibitions are merely "presumptively lawful," implying that some could be unconstitutional in some circumstances.[37] But this is not one of those circumstances.

If it is true that "legislatures have the power to prohibit dangerous people from possessing guns,"[38]—and *Rahimi's* holding confirms as much[39]—then those convicted of felonies that demonstrate dangerousness can in some circumstances be stripped of their right to possess a firearm. A felony conviction, after all, involves an individualized adjudication by a neutral magistrate (or jury) with all the trappings of due process, even more so than the adjudication at issue in *Rahimi*.

To be sure, not all felony convictions are created equal. It is difficult to conceive how a felony conviction for opening a bottle of ketchup at the store and placing it back on the shelf or reading someone else's email without permission might possibly demonstrate dangerousness—and those are actual felonies.[40] Moreover, blanket deference to legislative

---

[37] *See* 554 U.S. at 627 n.26.

[38] *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (Barrett, J., dissenting).

[39] 144 S. Ct. at 1903 ("An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment.").

[40] *See Folajtar v. Att'y Gen. United States of Am.*, 980 F.3d 897, 921 (3d Cir. 2020) (Bibas, J., dissenting) (citations omitted) (identifying these examples and making the broader point that "today, a felony is whatever the legislature says it is. The category is elastic, unbounded, and manipulable by legislatures and prosecutors.").

judgments about what constitutes felonious conduct runs headlong into *Bruen's* explicit rejection of such deference as inappropriate in the context of this fundamental right.[41]

But Grizzard's convictions, and the judge-imposed conditions he was subject to as a result of those convictions, demonstrate that at the time he possessed this gun, he presented a continuing dangerousness to the public if in possession of a firearm. First, his convictions aren't for outlier felonies. As the Government points out, Grizzard's possession of cocaine with intent to distribute, for example, has been deemed a felony by every state legislature and Congress.[42]

Second, even if possession of drugs with intent to distribute, possession of drug paraphernalia, possession of drug proceeds, and possession of a firearm while in the commission of a felony aren't the sort of "violent" crimes that were covered by § 922(g)(1)'s earliest predecessor, they are certainly the type of felonies that—like violent crimes—demonstrate dangerousness. After all, "drugs and guns are a dangerous combination."[43] Courts and Congress have long recognized that drug trafficking presents inherent dangers to the community that distinguish it from mere possessory offenses or non-violent property crimes, which is precisely why trafficking crimes generally carry

---

[41] *Bruen*, 597 U.S. at 26 ("But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here.").

[42] Gov't's Resp. (Dkt. 29), at 12.

[43] *Smith v. United States*, 508 U.S. 223, 240 (1993).

much harsher potential penalties.[44] Moreover, drug trafficking frequently involves violence or threats of violence. Indeed, the very nature of the illegal drug trade—involving large sums of money, valuable contraband, and the absence of legal dispute resolution mechanisms—creates strong incentives for participants to arm themselves. And that is precisely what Grizzard did, not only with the "spray-and-pray" fully-automatic Glock pistol he possessed here, but also with the firearm he was previously convicted of possessing while in the commission of possession of drugs with intent to distribute.

In short, Grizzard's demonstrated willingness to combine firearms with drug trafficking activities establish that his continued involvement in the inherently dangerous drug trade was far from theoretical. This is not a case of a single non-violent offense or technical violation, but rather a pattern of conduct that places both Grizzard and others at heightened risk when he possesses firearms. This point likely seemed obvious to the state court judge who made an individualized determination that a condition of Grizzard's suspended sentence be that he not possess a firearm. And that individualized determination by a neutral magistrate is akin to the individualized determination of dangerousness that the *Rahimi* court viewed as clearly justifying a temporary stripping of the right to possess a firearm.[45] And if the temporary stripping of the right that was effectuated by the

---

[44] *Compare* 21 U.S.C. § 841(b) (providing the penalties for drug trafficking crimes), *with* 21 U.S.C. § 844(a) (providing the penalty for simple possession).

[45] The *Rahimi* holding is perhaps more narrow in that it pointed to an individualized determination of dangerousness to "another," though it isn't clear whether that means "another specific individual" or any member of the public at large. *See* 144 S. Ct. at 1901. But again, the *Heller* dicta endorses the broader conception of the requisite threat embodied by categorical restrictions like § 922(g)(1).

conditions of his suspended sentence is permissible—and Grizzard doesn't argue otherwise—then at the moment of his possession here, Grizzard had no right to possess a firearm (and certainly not a fully automatic Glock pistol that is an unusual weapon for either self- or collective defense) for a reason independent of his mere status as a felon.

In sum, both as a consequence of his dangerousness-demonstrating prior felony convictions and a consequence of the well-justified conditions imposed on him by a judge, Grizzard was a prohibited person, and that prohibition is consistent with the Second Amendment.

***

For these reasons, the Motion to Dismiss Count One of the Indictment is denied.

**IT IS SO ORDERED** this 21st day of November 2024.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE